IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**UNITED STATES OF AMERICA**

**v.**                                              **CAUSE NO. 1:21CR137-LG-BWR-2**

**ANTHONY LETOINE GILLIN**

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S**
**<u>MOTION TO QUASH ARREST AND SUPPRESS EVIDENCE</u>**

**BEFORE THE COURT** is the [79] Motion to Quash Arrest and Suppress

Evidence filed by Defendant Anthony Letoine Gillin.  The Government filed a

response in opposition to the Motion, and the parties presented testimony, evidence,

and argument to the Court at a hearing held on February 7, 2023.  The Court gave

the parties the opportunity to file supplemental briefs, but only the Government

chose to do so.  After considering the submissions and argument of the parties, the

record in this matter, and the applicable law, the Court finds that Gillin's Motion to

Quash and Suppress should be denied.

## BACKGROUND

On October 26, 2021, DEA task force officers assisted the Pearl River County

Sheriff's Office with the investigation of an overdose death.  (Compl. at 2, ECF No.

1).  They learned from a witness that narcotics containing fentanyl were being

distributed from a home located at 1620 Bender Street, Picayune, Mississippi.

(Pohlmann Aff., ECF No. 80-1).  They also determined that vehicles parked at the

home, which had previously been described by a witness, were registered to Bobbie

Jean Porter.  (Compl. at 2, ECF No. 1).  While conducting surveillance on the

property, DEA agents observed one of those vehicles, a black Nissan Altima, leave the property. (*Id.*)  Corporal Jesse Neumann of the Picayune Police Department stopped the Altima for speeding in a school zone. (Hearing Tr. at 5).  At the time, Neumann was unaware of the identity of the driver of the Altima, but the driver was later identified as Gillin. (*Id.* at 13-14).  Neumann noticed that Gillin had brass or metallic knuckles that contained a folding knife in his lap, and he asked Gillin to hand the weapon over. (*Id.* at 8-9).  He asked Gillin to step out of the car and permitted Gillin to reach into his pockets to retrieve his identification. (*Id.* at 9).  Gillin struggled to locate the identification and began to turn away from Neumann. (*Id.* at 27).  Neumann then conducted a pat down of Gillin and reached inside Gillin's pocket, retrieving a bundle of cash. (*Id.* at 28).

During this time, Sergeant Jason Pohlmann, who had over twenty years of experience in law enforcement, arrived to assist Neumann. (*Id.* at 32).  Pohlmann asked Gillin to move to the back of the Altima and pulled Gillin's shirt tight around his waist. (*Id.* at 32-34).  Pohlmann asked Gillin to place his hands on the back of the Altima and conducted a pat down of Gillin. (*Id.* at 36).  During this time, Pohlmann claims that he asked Gillin for permission to reach inside his pocket and Gillin consented. (*Id.* at 37).  Pohlmann found a plastic bag tied in a knot with what he believed was a controlled substance. (*Id.* at 38).

After Gillin was arrested, Pohlmann assisted DEA agents in securing the home at 1620 Bender Street while they sought a search warrant. (Aff. & Search Warrant, ECF No. 80-1).  Pohlmann testified that a field test performed on the

substance found in Gillin's pocket revealed that the substance was a mixture of methamphetamine and fentanyl.  (*Id.*)

A municipal court judge granted a search warrant to search the home based on an Affidavit signed by Pohlmann.  (*Id.*)  During their search of the home, officers found digital scales, fentanyl, a Glock 9mm handgun, extended magazines, U.S. currency, and ammunition.  (*Id.*)

On November 16, 2021, Gillin and Porter were each indicted with one count of conspiracy to possess with intent to distribute Fentanyl, a Schedule II controlled substance.  (Indictment, ECF No. 25).  They were also charged with separate counts of possession with intent to distribute a mixture or substance containing a detectable amount of Fentanyl.  (*Id.*)

Gillin filed the present [79] Motion to Quash Arrest and Suppress, arguing that the officers were not justified in doing a pat down search.  In the alternative, he claims that the pat down search conducted by officers exceeded what was necessary to determine whether Gillin was armed.  He asks the Court to suppress all evidence seized, including the evidence found at the home on 1620 Bender Street.

## DISCUSSION

"The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights."  *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014) (quoting *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir.

1993)).  The Fourth Amendment provides that "[t]he right of the people to be secure

in their persons, houses, papers, and effects, against unreasonable searches and

seizures, shall not be violated, and no [w]arrants shall issue, but upon probable

cause, supported by [o]ath or affirmation, and particularly describing the place to be

searched, and the persons or things to be seized."  U.S. Const. amend. IV.

## I.  WHETHER THE OFFICERS WERE JUSTIFIED IN CONDUCTING A PAT DOWN SEARCH OF GILLIN

Gillin argues that Neumann and Pohlmann must not have felt that Gillin

posed a threat to their safety because Neumann allowed Gillin to reach inside his

pocket to obtain his identification.  Gillin explains:

> Had Neumann and/or Pohlmann held any belief, whether reasonable
> or not, that Mr. Gillin may be hiding a weapon on his person, [they]
> certainly would not have allowed [him] to rummage these hidden areas
> without a hint of concern.  Therefore, Neumann and/or Pohlmann were
> simply not justified in believing Mr. Gillin was 'presently dangerous to
> him or others,' as required to lawfully conduct the pat down search.

(Def.'s Mem. at 8, ECF No. 80).

"[L]imited pat-down searches are permissible 'for the protection of the police

officer, where he has reason to believe that he is dealing with an armed and

dangerous individual, regardless of whether he has probable cause to arrest the

individual for a crime.'"  *United States v. Jenson*, 462 F.3d 399, 407 (5th Cir. 2006)

(quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).  The searching officer must be able to

"point to specific and articulable facts suggesting actual physical risk to himself or

others."  *Id.*  "An officer need not be certain that an individual is armed; the issue is

whether a reasonably prudent man could believe, based on 'specific and articulable

facts,' that his safety or that of others is in danger." *United States v. Ledet*, 385 F. App'x 392, 394-95 (5th Cir. 2010) (quoting *United States v. Michelletti*, 13 F.3d 838, 840-41 (5th Cir. 1994)).

Neumann testified at the hearing on the Motion to Suppress that he initially allowed Gillin to reach inside his pocket because Gillin had been cooperative.  (Tr. at 9).  However, after Gillin began digging inside the pocket and tugging on it, Neumann believed that Gillin was attempting to conceal something inside of the pocket.  (*Id.* at 9).  Neumann explained that it appeared as though Gillin was attempting to manipulate something inside the pocket to keep it from accidentally coming out of the pocket.  (*Id.* at 27).  Therefore, Neumann asked Gillin to put his hands on top of the vehicle so that he could perform a pat down.  (*Id.* at 10).  He asked Gillin what was inside his pocket because he felt a large, soft lump.  (*Id.*)  Based on his training and experience, this lump appeared to be narcotics.  (*Id.*)  Neumann reached into the pocket and retrieved cash.  (*Id.* at 28).  Neumann's pat down of Gillin did not uncover weapons, controlled substances or any other contraband.

Pohlmann testified at the hearing that he asked Gillin to move to the back of the vehicle, away from the interior of Gillin's car because he knew from a previous encounter that Gillin was a convicted felon who was around firearms.  (*Id.* at 32).  He also noticed a "bulge" in Gillin's pocket and that Gillin was acting "shifty" and "favoring his pockets."  (*Id.* at 32-33, 35).  Pohlmann testified that Gillin's baggy clothing could have concealed a weapon, so he pulled Gillin's shirt tight to see

whether there was a weapon in Gillin's waistband as he moved Gillin to the back of the vehicle. (*Id.* at 34). As Pohlmann pulled Gillin to the back of the vehicle, Pohlmann noticed that Gillin was twisting away from him as though trying to hide something. (*Id.* at 35). After reaching the back of the vehicle, Pohlmann performed a pat down of Gillin's right, front pocket. (*Id.* at 36). Since all of the testimony before the Court, which is supported by the video of the stop, indicates that Pohlmann's pat down was conducted to ensure officer safety, the pat down was permissible.

## II. WHETHER THE PAT DOWN SEARCH EXCEEDED WHAT WAS NECESSARY TO DETERMINE WHETHER GILLIN WAS ARMED

In his Motion and accompanying memorandum Gillin claims that Officer Neumann "squeeze[d] and manipulate[d] the contents inside [his] right pocket, ask[ed] him what [was] there, reached into the pocket without consent and knowing the items were not weapons, removed cash and handed it to Pohlmann." (Def.'s Mem. at 11, ECF No. 80). Gillin argues that Pohlmann then began his own search, "removing all items from Mr. Gillin's pocket." (*Id.*) He also points out that this search lasted ninety seconds before Pohlmann removed what is alleged to be illegal drugs.

The Supreme Court has held:

If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass ***makes its identity immediately apparent***, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

*Minnesota v. Dickerson*, 508 U.S. 366, 375-76 (1993) (emphasis added).[1]  In

*Dickerson*, the Court held that an officer's search was not permissible where the

officer knew there were no weapons in the pocket and it was necessary for him to

squeeze, slide, and manipulate the contents of the defendant's pocket in order to

determine that the contents were contraband.  *Id.* at 378-79.

In contrast, Pohlmann testified that he felt a plastic knot with a round

substance while conducting a pat down of Gillin's right, front pocket.  Based on his

training and experience, this is the manner in which illegal narcotics are normally

packaged.  (*Id.* at 38).  He also noticed a "bulge" in the pocket but could not tell if

anything was behind the "bulge."  (*Id.* at 36).  He has conducted numerous pat

downs during his over twenty-year career, and he is familiar with how a plastic

knot containing drugs feels in someone's pocket, particularly the way in which the

knot rolls in the pocket.  (*Id.* at 47-49).  He testified that it was not necessary for

him to manipulate or squeeze the contents of the pocket to identify the item as a

bag of narcotics.  (*Id.* at 49).  The video taken by Officer Neumann's body camera

confirms that Gillin's right front pocket was very deep and contained numerous

items, including a large amount of cash, a package of cigarettes, an item resembling

a credit card, a gold-colored chain, and a plastic bag twisted around a powdery

---

[1] "The rationale of the plain-view doctrine is that if contraband is left in open view
and is observed by a police officer from a lawful vantage point, there has been no
invasion of a legitimate expectation of privacy and thus no 'search' within the
meaning of the Fourth Amendment—or at least no search independent of the initial
intrusion that gave the officers their vantage point."  *Dickerson*, 508 U.S. at 375.

substance.  Pohlmann testified that the pocket was large enough to contain a

firearm or another type of weapon.  (*Id.* at 47-48).

> As the Third Circuit has explained:
>
> The proper question . . . is not the immediacy and certainty with which an officer knows an object to be contraband or the amount of manipulation required to acquire that knowledge, but rather what the officer believes the object is by the time he concludes that it is not a weapon. That is, a *Terry* search cannot purposely be used to discover contraband, but it is permissible that contraband be confiscated if spontaneously discovered during a properly executed *Terry* search. Moreover, when determining whether the scope of a particular *Terry* search was proper, the areas of focus should be whether the officer had probable cause to believe an object was contraband before he knew it not to be a weapon and whether he acquired that knowledge in a manner consistent with a routine frisk.

*United States v. Yamba*, 506 F.3d 251, 259 (3d Cir. 2007).  Pohlmann was

authorized to make certain that Gillin did not have any weapons in his pockets.

Moreover, Pohlman testified that he had probable cause to believe that the knotted

plastic he felt during the pat down was contraband controlled substances.  Under

the *Dickerson*, "plain feel doctrine" he was permitted to retrieve and seize the

bagged substance from Gillin's pocket.  *See also United States v. Jones,* 303 F.Supp.

2d 702 (D.Md. 2004)

## III.  CONSENT

Even if Pohlmann had not determined by feel that Gillin had contraband in

his pocket, he testified that Gillin consented to the search of the pocket.  "A search

conducted pursuant to consent . . . remains one of the well-settled exceptions to the

Fourth Amendment's warrant and probable-cause requirements." *United States v.*

*Michalik*, 5 F.4th 583, 589 (5th Cir. 2021).  Courts must first consider whether the

Government has proved that the defendant consented. *United States v. Freeman*, 482 F.3d 829, 831 (5th Cir. 2007). The second issue is voluntariness, which is evaluated using a six-factor test:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. All six factors are relevant, but no single one is dispositive or controlling.

*Id.* at 831-32. The burden of proving voluntariness is on the Government. *Id.* at 831. The third and fourth issues are the scope of the consent and whether the defendant had authority to consent. *Id.*

The Government has shown, through Pohlmann's uncontradicted testimony, that Gillin consented to the search of his pocket. The testimony and evidence the Government presented also indicates that Gillin was cooperative throughout his encounter with Pohlmann and Neumann, and he is knowledgeable about criminal procedures due to his criminal history. There also appeared to be no coercion on the part of the officers. Based on the totality of the circumstances, the Court finds that Gillin's consent was voluntary. Therefore, even if Pohlmann had not determined that Gillin possessed contraband before reaching inside Gillin's pocket, Gillin consented to the search of the pocket which ultimately concealed illegal controlled substances.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [79] Motion to Quash Arrest and Suppress Evidence filed by Defendant Anthony Letoine Gillin is **DENIED**.

**SO ORDERED AND ADJUDGED** this the 17th day of February, 2023.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE